IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NUMBER 16-476 |
| : | |
| RUBEN DARIO PENA-ORTIZ : | |

## DEFENDANT'S SENTENCING MEMORANDUM

### I. INTRODUCTION

Ruben Dario Pena-Ortiz, a 45-year-old citizen of the Dominican Republic, was indicted by the federal grand jury and charged with one count of reentry after deportation, in violation of 8 U.S.C. § 1326(a) and (b)(2). On February 28, 2017, he entered a guilty plea to the charge before the Honorable Edward G. Smith. Mr. Pena-Ortiz has been in continuous custody since May 31, 2016, approximately one year.[1] Sentencing has been scheduled for June 5, 2017.

The defense has no objections to the presentence report (PSR) that was prepared in this case. Mr. Pena-Ortiz faces an advisory guideline range of 24-30 months, which he respectfully submits is "greater than necessary" to satisfy of the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The government's request for an upward variance is unsupported by the evidence.

Mr. Pena-Ortiz is the father of two teenage children, both of whom are American citizens who were born and raised in this country. Moreover, two of his siblings reside in Massachusetts, where both of his children also live with their mother. His ties to this country are deep indeed.

---

[1] Mr. Pena-Ortiz was arrested on that date in Northampton County, Pennsylvania, attempting to obtain a driver's license. PSR ¶ 35. On October 24, 2016, he was brought into ICE custody and was then transferred into the custody of the U.S. Marshal on November 15, 2017. He has remained in Marshal custody since that date. It is apparent that his time spent in ICE custody was not for the administrative purpose of commencing removal proceedings, but rather was pending referral of his case for criminal prosecution.

That said, he is sincerely remorseful for his past mistakes, and accepts full responsibility for them. Now that his two children are almost grown and nearly out of high school, he no longer feels the same pressure to be physically close to them, and he knows that he can continue parenting from afar. He is tired of living in the shadows of our society, understands that that he cannot return to this country, and has no intention of ever doing so in the future. As set forth below, he respectfully seeks a downward variance, in light of the totality of mitigating circumstances involved in his case.

## II. DEFENDANT'S BACKGROUND AND PARTICIPATION IN OFFENSE

The PSR accurately sets forth Mr. Pena-Ortiz's background and prior contacts with the immigration system in this country. It is undisputed that he was previously removed twice from the United States: on August 8, 2004 and November 19, 2013. PSR ¶ 8. It is also undisputed that his children, along with two of his siblings, live in Massachusetts, where the defendant has deep roots. PSR ¶¶ 46, 49. His story is reminiscent of many others who come here from underdeveloped countries in search of a better life, but it is also a story uniquely his own.

Mr. Pena-Ortiz grew up in the Dominican Republic in impoverished circumstances. He and his maternal half-siblings were raised primarily by their mother and grandmother, without financial help or emotional support from the defendant's father. PSR ¶ 48. His mother worked in a hospital and his grandmother worked on a farm to try to make ends meet. *Id.* With meager earnings and five children to feed, the family often went hungry and lacked the basic necessities *Id.*

Mr. Pena-Ortiz was forced to leave school after completing the ninth grade, to find work to help support the family. PSR ¶¶ 48, 62. His first job involved installing car radios. PSR ¶ 48. Given his country's devastated economy, it was difficult to find jobs that paid a living wage. Mr. Pena-Ortiz was extremely young and immature, only 23-years old, when he first arrived in the

2

United States.[2] He had dreams of finding gainful employment and sending money home to his mother and other family members who stayed behind. He settled in Massachusetts, which has a large population of Dominican nationals. Two of his siblings later settled in that region, and ultimately obtained legal status in this country. The area surrounding Boston is where he has maintained his strongest ties in this country.

It is not hard to imagine how a young man in his early twenties, living in the shadows of our economy because of his undocumented status, could get in with the wrong people and venture into a lifestyle that would ordinarily be out of character. It was never his intention to engage in criminal conduct when he first arrived here, but this is what happened when he fell in with a group of people who were dealing drugs in the Boston suburbs during the mid-1990s. The defendant was not a drug user himself,[3] but he needed money and the income was steady. In retrospect, Mr. Pena-Ortiz realizes how extremely poor his judgment was at that time, and he deeply regrets his actions. Not only was his conduct harmful to the community, but his convictions render him ineligible to ever gain legal status in this country. That reality has been the harshest possible punishment.

As the PSR reflects, all of Mr. Pena-Ortiz's drug activity occurred *before* his first removal, and he *never again* engaged in such conduct after that time.[4] Moreover, he never rose above being a small, street-level seller, and his conduct involved no guns, threats, or violence of any kind. His convictions stem from two arrests in 1996, shortly after he arrived in this country, and a third arrest in 2003, not long after his children were born. PSR ¶¶ 31-33.

---

[2] The PSR, at f.n.5, reflects that Mr. Pena-Ortiz first arrived here on January 8, 1995.
[3] Mr. Pena-Ortiz did not abuse controlled substances, but was admittedly abusing alcohol throughout that time period. PSR ¶¶ 58-59. He stopped drinking alcohol shortly thereafter. *Id.* at ¶ 59.
[4] The government's sentencing submission paints the erroneous picture that Mr. Pena-Ortiz has been continuously dealing drugs for over 20 years.

The PSR clarifies that Mr. Pena-Ortiz was sentenced for the 2003 case first in time. He pled guilty in that case and on May 4, 2004, he received a sentence of 153 days' imprisonment (approximately five months). PSR ¶ 33. He was then removed several months later, on August 8, 2004. By that point, Mr. Pena-Ortiz and his paramour, Sally Cruz, had two toddler children, his daughter, Reni (now age 17), and son Randy (now age 16). PSR ¶ 49. It goes without saying that having to leave Ms. Cruz and their two young children was heartbreaking for Mr. Pena-Ortiz and his family.

It was his desire to reunite with his family that caused Mr. Pena-Ortiz to return after he was removed in 2004. PSR ¶ 53. He was determined to help raise and support his children. Upon his return, he focused his efforts on supporting his family through legitimate means, by installing television satellites, repairing computers, and doing other odd jobs. PSR ¶ 66. For him, the days of dealing drugs were long gone, a part of his youth and immaturity that he deeply regretted.

Unfortunately for him, he was arrested on July 17, 2011, following a routine traffic stop. PSR ¶ 34. The police discovered his undocumented status and that his two 1996 arrests were still open. He was brought to criminal court to answer those charges, and he promptly agreed to consolidate both matters for plea and sentencing. As the PSR reflects, he received 2½ years on the first case, and a consecutive 2-year period of probation on the second. After completing his sentence, Mr. Pena-Ortiz was removed for the second time, on November 19, 2013.

Mr. Pena-Ortiz maintains that he would not have reentered this country again, except for the extraordinary circumstance he learned about recently, involving his daughter, now 17-years-old. He was no longer together with his children's mother, Ms. Cruz, because the relationship

was impossible to maintain under the circumstances. Despite that, he kept a close bond with his children and tried to support them financially and emotionally from afar. PSR ¶ 51.

Mr. Pena-Ortiz reports that he learned recently that his daughter was gay, and that she was emotionally struggling with the situation. Moreover, she was fearful that her father would reject her. Counsel has confirmed the above, through speaking with other family members in Massachusetts. Despite widespread acceptance of same-sex relationships both here and abroad, there is no question that homosexuality has traditionally been frowned upon by the Latin culture and its religious teachings. Mr. Pena-Ortiz admits that he was initially shocked to learn the news, but that as time wore on, he grew at peace with the issue and needed his daughter to know that he accepts her for who she is. He reports this as the motivating factor behind his return to this country, because he felt compelled to see his daughter in person to express his love and acceptance of her. His daughter is 17-years-old and ready to graduate from high school and move on to college. It is a pivotal time of her life, and he desperately wanted to be there for her.

Mr. Pena-Ortiz was in the Eastern District of Pennsylvania when he was arrested on May 31, 2016, applying for a driver's license in Easton, Pennsylvania. That arrest resulted in the *misdemeanor* conviction reflected in PSR ¶ 35, for which he received two years' probation.[5] He spent five months in prison on that case, with an ICE detainer lodged against him, and that time has not been credited anywhere to date.

Mr. Pena-Ortiz reports that he was on his way to Massachusetts, but had not yet arrived there. The defendant wants this Court to know that he is tired, and resigned to the fact that he cannot return to this country in the future and will not attempt to do so again. His children are older and do not need him as much as in earlier years, and they will be able to travel to see him

---

[5] PSR ¶ 21, f.n. 2, clarifies that the Northampton County conviction was for misdemeanor forgery under Pennsylvania law. However, as the statutory maximum penalty exceeds 13 months, it is considered a "felony" for purposes of the sentencing guideline calculations.

in the future. He is saddened by the situation, but accepts full responsibility for his conduct and recognizes that he has no one but himself to blame. His daughter knows that he loves her and that he tried his best to see her again. He is prepared to pay his debt to society and move on with his life.

### III.     CORRECTIONS TO PSR

The defense respectfully requests that PSR ¶ 33 be corrected to reflect that a sentence of 153 days was imposed in that case.

### IV.     GOVERNMENT'S REQUEST FOR UPWARD VARIANCE IS UNSUPPORTED BY THE EVIDENCE

The government's request for an upward variance is entirely unsupported by the evidence in this case. It appears to argue, at pp.4-5 of its sentencing submission, that because Mr. Pena-Ortiz would have received a higher sentence under the old version of USSG § 2L1.2, this Court should vary above the current, amended version that applies to this case. The government's argument is unpersuasive. The guidelines have been properly calculated in the PSR, and the government's apparent preference for the earlier, harsher version does not constitute legal justification to sentence above the range. Nor are there any aggravating circumstances justifying a sentence above the guideline range.

The government argues incorrectly that the current guideline "fail[s] to capture two [sic] defendant's serious narcotics felony charges in the guidelines calculations." Gov't. Memo at p.4. This presumably refers to the 1996 cases that are reflected in PSR ¶¶ 31-32. The government is wrong. Both matters received criminal history points, despite the fact that they are well over *twenty* years old. *Id.* They would have been too remote to count for criminal history points, but for the fact that they were not sentenced until 2011, after the defendant returned following his

first removal in 2004. As it stands, they were certainly captured in the guideline calculations despite their stale age.

The fact that they do not count to enhance the offense level *in addition to* the criminal history score is a deliberate result of Amendment 802, which revised the illegal reentry guideline to both simplify it and provide more fairness to a penalty scheme that was widely viewed as unreasonably harsh. In its wisdom, the Sentencing Commission made the policy choices it did about which prior convictions should be used to enhance the offense level. The government's apparent displeasure with those policy choices is not relevant. Its argument ignores the many years of careful study undertaken by the Sentencing Commission that preceded the revised version currently in effect and applicable to this case.

The Sentencing Commission explained its thinking in the "Reason For Amendment" section set forth in the Supplement to Appendix C. The Commission explains that the amendment "is a result of the Commission's multi-year study of immigration offenses and related guidelines, and reflects extensive data collection and analysis relating to immigration offenses and offenders…." Amendment 802 was intended, *inter alia,* to simplify the complexity in the prior version and to more adequately and fairly account for prior convictions. It notes that public comment and sentencing data "indicated that the existing 16- and 12-level enhancements for certain prior felonies committed before a defendant's deportation were overly severe [and courts were sentencing below the range in substantial percentages]…. *Id.* The defense submits that an upward variance for the reasons cited by the government would create unwarranted disparity, which is precisely what the guidelines are intended to avoid.

The government goes on to suggest at p.5, without *any* support, that since Mr. Pena-Ortiz received a 30-month sentence under the old guideline for his prior illegal reentry conviction, it

7

would be inappropriate for him to receive the same or lesser sentence now, under the newly-amended guideline.[6] Again, the government is mistaken. There is no empirical support for the proposition that a successive sentence imposed by a court must be harsher than a preceding sentence to accomplish the statutory purposes of sentencing. Such a robotic approach ignores the fundamental principle underlying federal sentencing: that a sentence should not be "greater than necessary" to accomplish the purposes of sentencing,[7] and that sentences should fit the offense and the offender, for each defendant and each case is unique, and a defendant sentenced years ago may be – as is true here -- a vastly different person from the individual at the bar of the court.

The government paints Mr. Pena-Ortiz's background too harshly, for he has never been convicted of violent or threatening behavior, or offenses involving guns or other weapons. Regrettably, he was a low-level street seller of drugs for a period of time *before* his first removal from this country, and he never engaged in such conduct thereafter. That said, he was clearly the lowest actor on the totem pole of the drug distribution culture, as opposed to a sophisticated dealer of large quantities of drugs, or someone who recruited or supervised others in the drug hierarchy. He has already paid the harshest possible penalty for those offenses, for his drug convictions render him ineligible to lawfully return to this country in the future.

Finally, each argument presented by the government in its analysis of the sentencing factors is misplaced. Gov't. Memo at pp. 7-9. Paragraph A, which addresses the nature and circumstances of the offense and the history and characteristics of the defendant, erroneously

---

[6] The government's assertion on p.5 that Mr. Pena-Ortiz "came back anyway to continue to engage in criminal activity in the United States" is inaccurate. As stated, his drug dealing occurred *before* his first removal, and he committed no crimes after his return to this country the first or second time, but for his actions in trying to obtain a driver's license. PSR ¶ 35. Obtaining some form of identification document is regrettably what happens if people living in the shadows want to find gainful employment. It is unfair to describe that conduct as evidence that the defendant returned "to continue to engage in criminal activity." As explained above, Mr. Pena-Ortiz returned to be with his family and children. The government has presented nothing to rebut that.
[7] 18 U.S.C. § 3553(a).

8

states that the "sentencing guidelines fail to include [the defendant's] most serious narcotics offense, the distribution of heroin [reflected at PSR ¶ 31]. As discussed above, the PSR assigns 3 criminal history points to this conviction, which demonstrates that the guidelines have accounted for that offense. Paragraph B, which addresses the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, confuses the instant illegal reentry offense with the defendant's prior drug convictions, and improperly asks the Court to punish him for his remote drug activity and not the instant offense. Paragraph C, which addresses specific and general deterrence, appears to argue that a harsh sentence will protect the public by deterring future drug dealing, should this defendant be "tempted to continue to engage in drug dealing…." It does not address the instant offense conduct. Gov't Memo at p.8. Paragraph D, which addresses educational and vocational training, medical care, or other correctional treatment, erroneously asserts that Mr. Pena-Ortiz "will have the opportunity to take advantage of the various educational and vocational programs in the federal prison system that will give the defendant a head start once he returns to civilian life." In fact, his undocumented status means that Mr. Pena-Ortiz will *not* be eligible for such programs, which are only available to American-citizen inmates. Paragraph E addresses the guidelines and policy statements, and again argues without any support that the Court needs to impose a harsher sentence than what was imposed in the defendant's prior reentry case. Finally, Paragraph F, which addresses unwarranted disparity, appears to make the illogical and incorrect argument that an upward variance promotes uniformity. It goes without saying that the need to avoid unwarranted disparity is served by a sentence within the guideline range, which is the foundational premise of the federal sentencing guideline scheme. In sum, the government's arguments for an upward variance are unpersuasive and unsupported by the evidence.

V.     **APPROPRIATE DISPOSITION**

The defense respectfully seeks a downward variance from the advisory range of 24-30 months, for the reasons that follow.

(A)     Harsher Confinement Conditions for Undocumented Inmates: As an undocumented person, Mr. Pena-Ortiz will serve "harsher" prison time than would an American citizen, because he is ineligible for a minimum security or prison camp designation, a halfway house placement at the tail end of his sentence, and a multitude of prison jobs and programs within the Federal Bureau of Prisons system. Moreover, he will clearly have to serve additional time behind bars in administrative custody after completing the instant sentence, awaiting removal to the Dominican Republic.

(B)     Uncredited Time Served in State Custody:  As explained above, Mr. Pena-Ortiz spent approximately five months in Northampton County custody pursuant to the matter reflected in PSR ¶ 35. He was arrested on May 31, 2016, and has remained in continuous custody from that date. An ICE detainer was lodged against him throughout that period. On October 21, 2016, he was sentenced for the misdemeanor forgery offense to two years of probation, such that the time he spent in state custody has not been credited to anything at this point. Mr. Pena-Ortiz was then transferred into ICE custody on October 24, 2016, and then U.S. Marshal custody on November 15, 2016. PSR at p.1.

Application Note 6 to USSG § 2L1.2 encourages a downward departure (and the same reasoning supports a downward variance) under such circumstances, because the Sentencing Commission's multi-year study of this guideline disclosed the frequency with which this happens to defendants charged with illegal reentry. Application Note 6 reads as follows:

> In a case in which the defendant is located by immigration authorities while the defendant is serving time in state custody, whether pre- or post-conviction, for a state offense, the time served is not covered by an adjustment under § 5G1.3(b) and, accordingly, is not covered by a departure under § 5K2.23 (Discharged Terms of Imprisonment).... In such a case, the court may consider whether a departure is appropriate to reflect all or part of the time served in state custody, from the time immigration authorities locate the defendant until the service of the federal sentence commences, that the court determines will not be credited to the federal sentence by the Bureau of Prisons. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.
>
> Such a departure should be considered only in cases where the departure is not likely to increase the risk to the public from further crimes of the defendant. In determining whether such a departure is appropriate, the court should consider, among other things, (A) whether the defendant engaged in additional criminal activity after illegally reentering the United States; (B) the seriousness of any such additional criminal activity, including (1) whether the defendant used violence or credible threats of violence or possessed a firearm or other dangerous weapon (or induced another person to do so) in connection with the criminal activity, (2) whether the criminal activity resulted in death or serious bodily injury to any person, and (3) whether the defendant was an organizer, leader, manager, or supervisor of others in the criminal activity; and (C) the seriousness of the defendant's other criminal history.

The identical reasoning supports a downward variance in this case. It does not appear that the Bureau of Prisons will credit the time Mr. Pena-Ortiz served in Northampton County, as it was not related to the instant offense of conviction.[8] It is clear that this case fits squarely within the parameters of the encouraged departure, for Mr. Pena-Ortiz did not commit additional criminal activity after illegally reentering the United States and the underlying misdemeanor state offense reflected in PSR ¶ 35 did not involve violence, threats, injury, supervisory authority over other participants, etc., such that it was not otherwise "serious" within the meaning of this application note. A below-guideline sentence of at least five months is respectfully requested, to

---

[8] Counsel undersigned is waiting to hear back from BOP personnel regarding this issue.

equitably credit the time Mr. Pena-Ortiz served in Northampton County, which is not being credited to any other matter.

  (C) <u>Extraordinary Family Responsibilities</u>: At the heart of this case is a 45-year-old father who no longer resembles the immature and reckless youth who committed the drug sales years ago, as reflected in the PSR. He never engaged in such conduct after he was removed from this country for the first time in 2004. It is hard to imagine being separated from one's children in the way that Mr. Pena-Ortiz has been. He returned to this country twice after his first removal, not to continue committing crimes as the government without foundation asserts, but because his children were young and needed his financial and emotional support. Despite his illegal status, he felt that his children and family had to come first. Such instincts are human and noble, and while they do not excuse his instant offense conduct, they help to place it in its proper perspective. He will advise the Court at the time of sentencing that his children are now older, and do not need him with them in the ways they did when they were younger. He is tired of the shadow existence and will never return to this country in the future, without permission from the appropriate government officials. The defense respectfully submits that the defendant's motivation for returning to this country is a compelling, mitigating factor that warrants a downward variance below the advisory range.

## VI. <u>CONCLUSION</u>

Under the totality of mitigating circumstances in this case, the defense respectfully seeks a sentence not to exceed one year and one day. At whatever point he completes the instant sentence, he will be placed in administrative ICE custody and removed from this country. Such a sentence is sufficient but not greater than necessary to accomplish all of the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

                                                                        Respectfully submitted,

                                                                         */s/ Felicia Sarner*
                                                                         FELICIA SARNER
                                                                         Assistant Federal Defender

# CERTIFICATE OF SERVICE

I, Felicia Sarner, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have filed and served a copy of the Defendant's Sentencing Memorandum, by electronic notification and/or hand delivery to the office of Katherine Driscoll, Assistant United States Attorney, office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

/s/ Felicia Sarner
FELICIA SARNER
Assistant Federal Defender

DATE:   May 25, 2017